## Case No. 15,404.

### UNITED STATES v. HOWARD et al.

[3 Wash. C. C. 340.] [1]

Circuit Court, D. Pennsylvania. April Term, 1818.

PIRACY—CONSTRUCTION OF STATUTE—CONFEDERATING WITH PIRATES—EVIDENCE.

1. Indictment for confederacy with pirates, knowing them to be guilty as such.

2. The crimes of piracy mentioned in the 8th section of the act for the punishment of certain crimes, passed April 30. 1790 [1 Stat. 112], are such as are committed by citizens of the United States. or on board of vessels of the United States. and therefore, the 10th and 11th sections. as to accessaries, refer to the acts of piracy mentioned in the 8th section.

[Cited in U. S. v. Kessler, Case No. 15,528.]

[1] [Originally published from the MSS. of Hon. Bushrod Washington. Associate Justice of the Supreme Court of the United States. under the supervision of Richard Peters, Jr., Esq.]

3. A confederacy by citizens on land, or on board of an American vessel, with sea robbers, or pirates, by the laws of nations; or the yielding up of a vessel by a citizen to such pirates, is within the provisions of the 8th section of the act of congress.

4. An endeavour by a mariner to corrupt the master of the vessel, and to induce him to go over to such pirates, is within the provisions of the 8th section of the law.

5. To establish the crime of confederacy, there must be some proof of criminal intentions in the person charged.

6. The language of the 12th section of the law implies compact and association with the pirates, as well in relation to the past, as to the future.

7. Any intercourse with them, which is calculated to promote their views, is within the provisions of the law.

Indictment for consulting, combining, confederating, and corresponding, with certain pirates and robbers on the seas, the defendants [Howard and Beebee], knowing them to be guilty of piracy and robbery.

The material facts in the cause, as acknowledged by the defendants, (for there was no other testimony given to support the indictment,) was, that on the 10th of July, 1817, the defendants, being branch pilots, belonging to the Delaware bay and river, spoke a small black schooner at sea, about twenty miles south of the Capes of Delaware, bound, as she said, from New-Orleans to New-York. The defendants asked the persons on board, if they would accept of some fresh fish, which they consented to do, and gave the defendants, in return, some gin. This was stated by other witnesses to be a common occurrence, when ships from sea are met with by pilot boats, and is considered as a mere interchange of civilities. Whilst the defendants were alongside of the schooner, the apparent commander of her offered them 5000 dollars, to land them and their effects somewhere on the Delaware, which the defendants refused, considering the conduct and appearance of those persons to be suspicious, and fearing, that by acceding to their proposal, they might incur the risk of a forfeiture of their boat, and expose themselves to a prosecution, which might deprive them of their liberty. The defendants then determined to seek a harbour within the Bay of Delaware, on account of the weather, which was threatening; and taking that course, the black schooner set all her sails, and followed the track of the pilot boat. The defendants had been previously requested to send a pilot on board the schooner, which they declined doing; but they permitted her to follow them in, around the point of Cape May, where both vessels came to anchor. The defendants then went on board the schooner, and demanded the usual pilotage to which they were entitled, where the pilot serves as a guide to a vessel into the bay, which was refused; but the commander of the schooner offered the defendants sixty dollars for their skiff, to enable him to land his crew and cargo. This was refused by the defendants, who, having un-

favourable suspicions of the persons on board of the schooner, determined to have nothing to do with them. Those persons then declared, that they would take the skiff by force, which they accomplished; and they conveyed themselves, five trunks, and a bag of specie, to a small fishing vessel lying at some distance from them, which they had previously ascertained would receive them and their baggage on board, and convey them up the Delaware. Before the departure of those men from the schooner, they talked of scuttling and sinking her, with such of the cargo as remained on board, after the five trunks were sent off. But, upon the representations of the defendants, that it would be a pity thus to destroy the property, and that it would be better to give it to them, they abandoned it altogether, leaving the vessel and remaining cargo in the defendants' possession. The defendants immediately set sail with the pilot boat and schooner for Lewistown, where they arrived on the 11th, and immediately disclosed all the above facts to the revenue officer at that port, and stated their claim, which they afterwards prosecuted, to the vessel and cargo as derelict, or for salvage.

It was contended, by the district attorney, that the word "pirate," in that part of the 12th section of the act of congress, for punishing certain crimes against the United States (vol. 2, Last Ed. 94), on which this indictment was framed, ought to be construed to mean any "sea robber," according to the definition of a pirate by the law of nations, and ought not to be confined to pirates and robbers, as described by the 8th section of the above act of congress; and that the evidence was sufficiently strong, to justify the jury in presuming, that the persons on board the black schooner were guilty of acts of piracy under the law of nations; and that the defendants knew, or had such reasons for suspecting them of having been guilty of this crime, as should have prevented them from having any correspondence with them. He contended, lastly, that any kind of correspondence or intercourse with pirates, known by the person accused to be such, amounts to a correspondence within the intent and meaning of the law; and that the various acts of the defendants, in relation to the alleged pirates, clearly amounted to such correspondence.

The following books were referred to, to show who are pirates by the law of nations: Bynk. (Dup. Ed.) p. 127, c. 17; 2 Azuni, Mar. Law, 350, pt. 2, c. 5, art. 3, § 3; 1 Emerig. pp. 533–539, c. 12, § 28; Vatt. Law Nat. bk. 1, c. 19, § 233; 4 Bl. Comm. 71, 72; 3 Chit. Cr. Law, 1127; 2 Valin, Comm. bk. 3, pp. 235–238, tit. 9, arts. 3, 4; The Federalist, No. 42; [Thirty Hogsheads of Sugar v. Boyle] 9 Cranch, [13 U. S.] 198; U. S. v. Jones [Case No. 15,494], in this court,—to prove that the common or civil law, from which a technical expression is taken, may be referred to, to expound it. He also cited U. S. v. Tully [Id.

16,545]; U. S. v. Ross [Id. 16,196]; U. S. v. Hayward [Id. 15,336].

Charles J. Ingersoll, U. S. Dist. Atty.

Condy & Read, for defendants.

The construction of the 12th section of the law, given by the district attorney. was controverted by the counsel for the defendants, who insisted, that the words "such piracies," referred to such as are declared to be so by the 8th section, and these are decided, in Palmer's Case [3 Wheat. (16 U. S.) 610], to be confined to robbery, and other acts of piracy committed on board of an American vessel. That the word "correspond," in the 12th section, should be construed by its associates, "combine" and "confederate," to mean an agreement to join with the pirate in some piratical act: and that the clause is altogether prospective. They insisted, that there was an absence of all evidence, to prove that the alleged pirates had committed acts of piracy or robbery—if they had, that the defendants did not know it, nor did they in any manner confederate or correspond with them, within the meaning and intention of the law. Cases cited. 2 East. P. C. 796, 797; 8 Mod. 74; 4 Bl. Comm. 72.

WASHINGTON, Circuit Justice (charging jury). The issue which you are to try is, whether the defendants are guilty of having combined, confederated, and consulted with pirates or robbers, knowing them to be guilty of any piracy or robbery. Your inquiries will consequently embrace the three following particulars:—1st. Had the alleged pirates been guilty of any act of piracy or robbery, at the time when the correspondence with them by the defendants is charged to have taken place?—2d. If so guilty, did the defendants know that fact?—3d. Did the defendants, having this knowledge, consult, correspond, combine, or confederate with the alleged pirates?—Unless you are perfectly satisfied, from the evidence upon each and all of these points, you ought to acquit the defendants.

The first inquiry involves the construction of the 12th section of the law under which the defendants are indicted; and the question is, whether the piracies and robberies intended by that section, are such as are declared to be so by the 8th section of the same law, or such as are defined and punished by the law of nations?

The opinion which has been entertained by some persons, that the courts of the United States might take cognizance of robberies and other piracies committed on the high seas, by non-commissioned sea rovers and others, contrary to the general law of nations, has never received the countenance of any of the courts of the United States.

A much more doubtful question, however, arose upon the construction of the act of congress, as to this offence, which was finally settled by the supreme court, in Palmer's Case [3 Wheat. (16 U. S.) 610]. This was, whether robbery on the high seas, committed on board of a foreign vessel, amounted to piracy, within the true intent and meaning of the 8th section, and was cognizable by the courts of the United States? The general and unqualified expressions of that section, most undoubtedly covered such a case; and yet it seemed difficult to believe, that the legislature could have intended to make many of the acts of piracy defined by that section, cognizable in an American court. It was, upon the whole, decided, that a robbery, committed by any person on the high seas, on board of a ship belonging exclusively to a foreign state, or to the subjects thereof, or upon the person of a subject of a foreign state, in a vessel belonging exclusively to subjects of a foreign state, is not piracy, within the true intent and meaning of the 8th section of that law. Although the offence of robbery is the only one stated in this decision; that being the only offence referred to in the question which was adjourned to the supreme court; yet there can be no doubt but that all the other acts of piracy, enumerated in that section, are included within the same principle. The 10th and 11th sections of the law, embrace the cases of accessaries before and after the fact; and, consequently, the offences of these persons must partake of the nature of the principal offences, independent of the word "aforesaid," which clearly refers to the piracies enumerated in the 8th section. We then come to the 12th section, upon one clause of which this indictment is founded. This section introduces a new set of offences, amounting only to misdemeanors, although they are declared to amount to piracy and felony, by the statute of Geo. I. c. 24, from which this section was obviously borrowed. Many of these offences are the offences of principals; others, and particularly that for which these defendants are indicted, more nearly resemble those of accessaries. The argument is, that, as confederating with pirates is necessarily accessorial to the principal offence, and as the accessaries, under the 10th and 11th sections, can be guilty of no offence but such as is made so by the 8th section, the words "such piracies," &c., in the 12th section, must find their antecedent in the same section. It is very true, that these words have no proper antecedent in the 12th section, and yet we think, that to refer them to the piracies stated in a remote section, with which the 12th section, is in no manner connected, and which embraces a different set of offences, would be inconsistent with the obvious intention of the legislature, as well as with correct grammatical construction. The 10th and 11th sections, as before observed, refer to the 8th, not only by express words of reference, but because the offences mentioned in them are declared to be those of accessaries, before and after the fact; and they are, therefore, strictly within the rule accessorius seq-

uitur, &c. But these reasons do not apply to the clause of the 12th section under consideration. The word "such" is not synonymous with "aforesaid." and has no necessary reference to the piracies defined by the 8th section of this act. The decision in Palmer's Case, does not require such a construction;—if it did, we should not hesitate to give it. That case decides, that the act of piracy must be committed on board of an American vessel; and, upon that principle, we are clear, that confederacy with pirates, on board of a foreign ship, would not be an offence within the 12th section. But in this case, the pilot boat is an American vessel. and the persons on board were citizens of the United States. The pirate, with whom the confederacy and correspondence takes place, may, in our opinion. be any sea robber or pirate, according to the general law of nations. Suppose, for instance, the captain of an American vessel were to yield up his vessel to such a pirate; could it be contended, that it would not be within the meaning, as it most unquestiona-bly is within the words, of the 8th section of the law? Upon the same ground, it appears to us, that, if a mariner endeavours to corrupt the master of an American vessel to go over to, or to confederate with pirates or sea robbers, whoever they may be. or to trade with them, or furnishing them with ammunition, &c.; or confederating or corresponding with them; are all offences within the words, as well as within the intent and meaning of the 12th section of this law; the word "such" intending to relate, (though very inaccurately,) to pirates and robbers before mentioned.

The question of fact, which you have to decide under this head, is, whether the men on board the schooner were pirates or robbers. according to the definition which we have just given of these words? Of this fact there is no positive proof; and what ground is there for presuming it? They offered the enormous sum of $5000 to be put on shore with five trunks.—They afterwards made an extravagant offer for the defendants' skiff for the same purpose. In short. their whole conduct was mysterious. and highly suspicious. The defendants themselves thought so. It was such as might free any person from the charge of uncharitableness, who should believe that they had committed. or intended to commit, some crime. But, is the conclusion a necessary one, that that crime was piracy or robbery? We have not the slightest information as to the history of these men at any time.—who they were—of what nation; —nor do we know the national character of their vessel; although the evidence. so far as it goes, would lead to the conclusion that she was Spanish. They might have acquired the property which they were so anxious to preserve. as well by robbery on land. by capture from Spanish subjects on the high seas, under a commission from the revolutionary government of South America. (which would not amount to acts of piracy,) as by unau-thorized robbery on the high seas. The master of this vessel may have run away with the cargo committed to his care, to transport from one place to another, which would be no offence within the 8th section of the act of congress. if the vessel was foreign, nor within the general law. Or, he may merely have intended a breach of the revenue laws of the United States, by smuggling his cargo on shore. Now. if the conduct of these men was equally consistent, whether they had committed any one of the above offences. as the offence of piracy, it would be carrying the doctrine of presumption to an alarming extent, for the jury to fix upon any particular crime, as that which those persons must have committed; and they ought to be perfectly satisfied, from the evidence, that the crime which these men had committed, (if, indeed, you are satisfied that they had committed any,) was the precise one of piracy or robbery, before they can convict them.

If these men were pirates and robbers, then the next inquiry for the jury to make is, 2. Whether the defendants knew that fact, at the time the alleged correspondence took place. Of this fact there is no proof. The defendants have never acknowledged that they knew, or that they even suspected, that these men were pirates; and this prosecution is supported altogether upon their own confessions. They stated. that they considered those persons as being very suspicious characters, which they might well do, without their opinions pointing at any particular crime. The refusal of the defendants to accept the tempting offer of 5000 dollars, to land them with their trunks. and the reason assigned that they might not only expose themselves to prosecution and imprisonment. but to a forfeiture of their vessel;—their prompt information to the officer of the customs, of every circumstance that had occurred; and their claim of the schooner and cargo as derelict. or for salvage, together with the irreproachable character which they are proved to have borne, present a case from which the jury may safely infer, that the defendants rather suspected those persons of an intention to smuggle, than that they had committed the crime charged against them by this prosecution. At all events, the jury ought to be well satisfied, that the defendants knew that these persons had been guilty of piracy.

The third inquiry for the jury, in case they should be against the defendants upon the first two points, is, whether they corresponded. &c., with those men? The court is inclined to think, that the different expressions used in the clause of the 12th section, on which this indictment is founded, mean nearly the same thing. They imply compact and association with the pirates, as well in relation to the past, as to future acts. Any intercourse with them, however inefficient or remote, which had a reference to the offence with which they are chargeable. and which

had a tendency, or was intended, in any manner, to promote their views, is, in the opinion of the court, an offence under this section. There must be something of criminal intention, in the person who confederates and corresponds with the pirates. The correspondence may be perfectly innocent;—it may be for the purpose of bringing the guilty persons to punishment;—or to dissuade them from a further prosecution of their guilty practices. To convict the defendants, something like a criminal participation must be shown. To exemplify these principles, we think, that if the schooner had followed the pilot boat into Delaware Bay, without any agreement or understanding between the parties, expressed, or implied;—and if the owner of the schooner choosing voluntarily to abandon the schooner and the remainder of her cargo, the defendants had possessed themselves of the property, and proceeded against it for salvage; the defendants would have been exempt from any charge of correspondence, combination, confederacy, or consulting. But they agreed, that the schooner might follow the pilot boat as a guide, and they ratified this agreement by demanding pilotage. They also asked of the alleged pirates, a donation of the vessel and the remainder of the cargo on board, which was acceded to. If the jury are satisfied, that the owners of the schooner and cargo were pirates, and that the defendants knew the fact, we should be of opinion, that these acts would amount to a correspondence and confederacy, within the true intent and meaning of the 12th section of the law under consideration.

The jury found the defendants not guilty.